**ORAL ARGUMENT NOT YET SCHEDULED**
No. 22-1080 (and consolidated cases)

# In the United States Court of Appeals for the District of Columbia Circuit

―――――――――――――

NATURAL RESOURCES DEFENSE COUNCIL,
*Petitioners,*

CLEAN FUELS DEVELOPMENT COALITION, ET AL.,
*Intervenors for Petitioners,*

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, ET AL.,
*Respondents,*

CITY AND COUNTY OF DENVER, COLORADO, ET AL.,
*Intervenors for Respondents.*

―――――――――――――

On Petition for Review from the
National Highway Traffic Safety Administration
(No. NHTSA-2021-0053)

―――――――――――――

## INITIAL BRIEF FOR INTERVENORS IN SUPPORT OF PETITIONERS

―――――――――――――

C. BOYDEN GRAY
JONATHAN BERRY
MICHAEL BUSCHBACHER
JARED M. KELSON
BOYDEN GRAY & ASSOCIATES, PLLC
801 17th Street NW, Suite 350
Washington, DC  20006
(202) 955-0620
buschbacher@boydengray
associates.com

*Counsel for Intervenors*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC  20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Intervenor
Valero Renewable Fuels
Company, LLC*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, intervenors Clean Fuels Development Coalition; Diamond Alternative Energy, LLC; ICM, Inc.; Illinois Corn Growers Association; Kansas Corn Growers Association; Kentucky Corn Growers Association; Michigan Corn Growers Association; Minnesota Soybean Growers Association; Missouri Corn Growers Association; Texas Corn Producers Association; Valero Renewable Fuels Company, LLC; and Wisconsin Corn Growers Association respectfully submit this Certificate as to Parties, Rulings, and Related Cases.

## A.      Parties

All parties, intervenors, and amici appearing in this Court are listed in the Initial Brief of Petitioner American Fuel & Petrochemical Manufacturers and State Petitioners and the subsequent amicus briefs filed in the consolidated cases.

## B.      Rulings Under Review

Under review is a final rule of the National Highway Traffic Safety Administration entitled *Corporate Average Fuel Economy Standards for Model Years 2024-2026 Passenger Cars and Light Trucks*, 87 Fed. Reg. 25,710 (May 2, 2022).

i

### C.    Related Cases

Two other consolidated cases in the U.S. Court of Appeals for the District of Columbia Circuit involve challenges to the same agency action at issue here: *Texas* v. *NHTSA*, No. 22-1144, and *American Fuel & Petrochemical Manufacturers* v. *NHTSA*, No. 22-1145.

Seven additional cases challenge a related rule promulgated by the Environmental Protection Agency that set tailpipe-emission standards for light-duty vehicles: *Texas* v. *EPA*, No. 22-1031; *Competitive Enterprise Institute* v. *EPA*, No. 22-1032; *Illinois Soybean Association* v. *EPA*, No. 22-1033; *American Fuel & Petrochemical Manufacturers* v. *EPA*, No. 22-1034; *Arizona* v. *EPA*, No. 22-1035; *Clean Fuels Development Coalition* v. *EPA*, No. 22-1036; and *Energy Marketers of America* v. *EPA*, No. 22-1038.

Finally, four other cases challenge a related rule promulgated by the EPA that rescinded the agency's previous withdrawal of a waiver from Clean Air Act preemption for California emission standards addressing global climate change: *Ohio* v. *EPA*, No. 22-1081; *Iowa Soybean Association* v. *EPA*, No. 22-1083; *American Fuel & Petrochemical Manufacturers* v. *EPA*, No. 22-1084; and *Clean Fuels Development Coalition* v. *EPA*, No. 22-1085.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, intervenors Clean Fuels Development Coalition; Diamond Alternative Energy, LLC; ICM, Inc.; Illinois Corn Growers Association; Kansas Corn Growers Association; Kentucky Corn Growers Association; Michigan Corn Growers Association; Minnesota Soybean Growers Association; Missouri Corn Growers Association; Texas Corn Producers Association; Valero Renewable Fuels Company, LLC; and Wisconsin Corn Growers Association hereby make the following disclosures:

**Clean Fuels Development Coalition** is a business league organization established in a manner consistent with Section 501(c)(6) of the Internal Revenue Code.  Established in 1988, the Coalition works with auto, agriculture, and biofuel interests in support of a broad range of energy and environmental programs.  It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in the Coalition.

**Diamond Alternative Energy, LLC**, a Delaware limited liability company, is a wholly owned direct subsidiary of Valero Energy Corporation, a Delaware corporation whose common stock is publicly traded on the New York Stock Exchange under the ticker symbol VLO.

iii

**ICM, Inc.** is a Kansas corporation that is a global leader in developing biorefining capabilities, especially for the production of ethanol.  It is a wholly owned subsidiary of ICM Holdings, Inc., and no publicly held company has a 10% or greater ownership interest in ICM Holdings, Inc.

**Illinois Corn Growers Association** is an agricultural organization.  It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**Kansas Corn Growers Association** is an agricultural organization.  It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**Kentucky Corn Growers Association** is an agricultural organization. It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**Michigan Corn Growers Association** is an agricultural organization. It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**Minnesota Soybean Growers Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.l(b).  Its members are soy-

bean farmers, their supporters, and members of soybean industries. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The Minnesota Soybean Growers Association is a not-for-profit corporation that is not a subsidiary of any corporation and that does not have any stock which can be owned by a publicly held company.

**Missouri Corn Growers Association** is an agricultural organization. It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**Texas Corn Producers Association** is an agricultural organization. It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**Valero Renewable Fuels Company, LLC**, a Texas limited liability company, is a wholly owned direct subsidiary of Valero Energy Corporation, a Delaware corporation whose common stock is publicly traded on the New York Stock Exchange under the ticker symbol VLO.

**Wisconsin Corn Growers Association** is an agricultural organization. It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

# TABLE OF CONTENTS

GLOSSARY ...........................................................................................xi

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ..........................................................3

STATEMENT OF THE ISSUES ..............................................................3

STATUTES AND REGULATIONS..........................................................3

STATEMENT OF THE CASE ..................................................................3

      A.     Statutory Background ..............................................................3

              1.     EPCA's Corporate Average Fuel Economy program .........3

              2.     Section 209 of the Clean Air Act ...........................................5

              3.     The Renewable Fuel Standard .................................................5

      B.     Regulatory Background .........................................................6

              1.     The SAFE rules ..................................................................6

               2.     The repeals of SAFE I and SAFE II ...................................7

SUMMARY OF ARGUMENT....................................................................10

STANDING................................................................................................12

STANDARD OF REVIEW ........................................................................13

ARGUMENT ............................................................................................13

I.     NHTSA's Consideration Of State Electric-Vehicle Mandates Is Contrary To Law....................................................................................14

      A.     EPCA Expressly Preempts State Electric-Vehicle Mandates.................................................................................14

      B.     The RFS Impliedly Preempts State Electric-Vehicle Mandates.................................................................................19

vi

C.    NHTSA's Reliance On Preempted State Laws Is Unlawful .......21

II.    The Rule Is Arbitrary And Capricious ....................................................22

CONCLUSION.................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*American Fed. of Gov't Emps., Loc. 2924* v. *Federal Lab. Rels. Auth.*,
  470 F.3d 375 (D.C. Cir. 2006)........................................................23

*American Fuel & Petrochemical Mfrs.* v. *EPA*,
  3 F.4th 373 (D.C. Cir. 2021) .......................................................12

*Americans for Clean Energy* v. *EPA* (*ACE*),
  864 F.3d 691 (D.C. Cir. 2017)...................................................5, 20

*Arizona* v. *United States*,
  567 U.S. 387 (2012)....................................................................20

*Central Valley Chrysler-Jeep, Inc.* v. *Goldstene*,
  529 F. Supp. 2d 1151 (E.D. Cal. 2007) ......................................19

*Delta Constr. Co.* v. *EPA*,
  783 F.3d 1291 (D.C. Cir. 2015)..............................................10, 15

*DHS* v. *Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020).............................................................22, 24

*FCC* v. *Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)....................................................................25

*FCC* v. *Prometheus Radio Project*,
  141 S. Ct. 1150 (2021)................................................................22

*FMC Corp.* v. *Holliday*,
  498 U.S. 52 (1990)......................................................................14

*Geier* v. *American Honda Motor Co.*,
  529 U.S. 861 (2000)....................................................................20

*Green Mountain Chrysler Plymouth Dodge Jeep* v. *Crombie*,
  508 F. Supp. 2d 295 (D. Vt. 2007) ..............................................19

*HollyFrontier Cheyenne Refining, LLC* v. *Renewable Fuels Association*,
  141 S. Ct. 2172 (2021)..................................................................6

*Hunt* v. *Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..................................................................12

*Little Sisters of the Poor Saints Peter & Paul Home* v.
*Pennsylvania*,
140 S. Ct. 2367 (2020)........................................................11, 22

*Metropolitan Taxicab Bd. of Trade* v. *City of New York*,
615 F.3d 152 (2d Cir. 2010) ...............................................16, 17

*Michigan* v. *EPA*,
576 U.S. 743 (2015)..................................................................22

*National Urb. League* v. *Ross*,
977 F.3d 770 (9th Cir. 2020).....................................................25

*New York State Conf. of Blue Cross & Blue Shield Plans* v.
*Travelers Ins. Co.*,
514 U.S. 645 (1995)..................................................................19

*Ophir* v. *City of Boston*,
647 F. Supp. 2d 86 (D. Mass. 2009) ...............................16, 17, 19

*Picur* v. *Kerry*,
128 F. Supp. 3d 302 (D.D.C. 2015) ..........................................25

*Pilot Life Ins. Co.* v. *Dedeaux*,
481 U.S. 41 (1987)....................................................................14

*Rowe* v. *New Hampshire Motor Transport Ass'n*,
552 U.S. 364 (2008)..................................................................14

*Sid Goodman & Co.* v. *United States*,
1991 WL 193489 (4th Cir. Oct. 1, 1991.....................................25

*West Virginia* v. *EPA*,
142 S. Ct. 2587 (2022)..............................................................20

**Statutes:**

5 U.S.C. § 706...................................................................13, 22

42 U.S.C.

§ 7507..........................................................................5
§ 7543..........................................................................5
§ 7545.......................................................................2, 3

ix

49 U.S.C.
   § 32902 ................................................................... 1, 4, 8, 11, 21
   § 32904 ................................................................................ 17, 18
   § 32919 .................................................................. 2, 3, 4, 10, 14

Pub. L. No. 94-163, 89 Stat. 871 (1975) ................................................ 3

Pub. L. No. 110-140, 121 Stat. 1492 (2007) ........................................ 5

## Rules and Regulations:

49 C.F.R. § 1.95(a) .............................................................................. 3

75 Fed. Reg. 25,324 (May 7, 2010) .................................................. 15

78 Fed. Reg. 2,112 (Jan. 9, 2013) ...................................................... 6

83 Fed. Reg. 42,986 (Aug. 24, 2018) ............................................... 17

84 Fed. Reg. 51,310 (Sep. 27, 2019) ........................................... 6, 18

85 Fed. Reg. 24,174 (Apr. 30, 2020) ........................................... 7, 15

86 Fed. Reg. 7,037 (Jan. 25, 2021) .................................................... 7

86 Fed. Reg. 74,236 (Dec. 29, 2021) ........................................ 7, 8, 24

86 Fed. Reg. 74,434 (Dec. 25, 2021) .................................................. 8

87 Fed. Reg. 14,332 (Mar. 14, 2022) .................................................. 8

87 Fed. Reg. 25,710 (May 2, 2022) ...................... 2, 9, 12, 13, 17, 21, 23, 25

Fed. R. App. P. 15(d) .......................................................................... 3

Cal. Code Regs. tit. 13 § 1962.2(a) .................................................. 15

## Legislative History:

S. Rep. No. 93-526 (1973) .................................................................. 4

Zero-Emission Vehicles Act of 2018,
   S. 3664, 115th Cong. (2018) ........................................................ 20

Zero-Emission Vehicles Act of 2019,
   H.R. 2764, 116th Cong. (2019) .................................................... 20

## Other Authorities:

Biden Plan for a Clean Energy Revolution and Environmental
   Justice, https://joebiden.com/climate-plan/# ................................ 7

# GLOSSARY

| | |
|---|---|
| AFPM | American Fuel & Petrochemical Manufacturers |
| APA | Administrative Procedure Act |
| EPA | U.S. Environmental Protection Agency |
| EPCA | Energy Policy and Conservation Act of 1975 |
| NHTSA | National Highway Traffic Safety Administration |
| RFS | Renewable Fuel Standard |
| SAFE I | The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, 84 Fed. Reg. 51,310 (Sept. 27, 2019) |
| SAFE II | The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks, 85 Fed. Reg. 24,174 (Apr. 30, 2020) |

## INTRODUCTION

In the Energy Policy and Conservation Act (EPCA), Congress charged the National Highway Traffic Safety Administration (NHTSA) with setting fuel-economy standards at the "maximum feasible" level. 49 U.S.C. § 32902(a). Congress expressly prohibited NHTSA, however, from considering the fuel economy of electric vehicles in setting those standards. 49 U.S.C. § 32902(h). So when NHTSA joined the Environmental Protection Agency (EPA) in a concerted effort to electrify the Nation's vehicle fleet, NHTSA could not directly require more electric vehicles. Instead, it tried to piggyback on state electrification efforts. It calculated a "baseline" fuel-economy standard that accounted for the significant number of electric vehicles that NHTSA projected would be on the road because of state electric-vehicle mandates, and it used that "baseline" to set its own standards.

NHTSA's maneuver was doubly flawed. First, as the coalition of AFPM and State Petitioners explain, EPCA unconditionally prohibits NHTSA from accounting for electric vehicles in setting fuel-economy standards, regardless of whether another regulator has forced their entry to the market. Initial AFPM Br. 27-35. Second, the state electric-vehicle mandates that NHTSA incorporated into its regulatory baseline are independently unlawful under

1

EPCA's preemption provision, as NHTSA itself previously determined. This time, NHTSA asserted that those state electric-vehicle mandates are "real" "legal obligations" that it would be "absurd" to ignore. 87 Fed. Reg. 25,710, 25,899 (May 2, 2022). But the agency declined to assess whether those state mandates are in fact valid.

They are not: they are preempted by EPCA—the very statute that NHTSA implements. EPCA expressly preempts all state laws that are "related to fuel economy" or "average fuel economy," including these state electric-vehicle mandates. 49 U.S.C. § 32919(a). The state mandates also frustrate Congress's purposes in the Renewable Fuel Standard (RFS), a separate statutory provision in which Congress focused its climate and energy policy on the promotion of renewable liquid fuels. *See* 42 U.S.C. § 7545(o).

The unlawfulness of the state electric-vehicle mandates undergirding NHTSA's rule means that NHTSA violated EPCA by promulgating standards that will force electrification. And at the very minimum, it was arbitrary and capricious for NHTSA not to analyze the legality of those state mandates— especially under a statute that the agency implements and had previously construed—before deeming them to be "legal obligations" that form a "real" part of the regulatory landscape. 87 Fed. Reg. at 25,899.

## JURISDICTIONAL STATEMENT

Intervenors adopt the jurisdictional statement filed by the AFPM and State Petitioners, and add that intervenors timely moved to intervene in support of petitioners on July 29, 2022. *See* Fed. R. App. P. 15(d).

## STATEMENT OF THE ISSUES

I.    Whether NHTSA acted contrary to law by relying on state electric-vehicle mandates in setting its fuel-economy standards even though those state mandates are preempted by EPCA, 49 U.S.C. § 32919(a), and the RFS, 42 U.S.C. § 7545(o).

II.    Whether NHTSA's failure to consider the legality of the state electric-vehicle mandates undergirding its fuel-economy standards is arbitrary and capricious.

## STATUTES AND REGULATIONS

Pertinent provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

### 1.    EPCA's Corporate Average Fuel Economy program

EPCA requires NHTSA to establish corporate average fuel economy standards applicable to manufacturers of new automobiles. Pub. L. No. 94-163 § 502(a)(1), 89 Stat. 871, 902 (1975); 49 C.F.R. § 1.95(a). NHTSA must set

those standards at the "maximum feasible" level.  49 U.S.C. § 32902(a).  In determining the "maximum feasible" standards, the statute requires NHTSA to consider some factors, and it prohibits the agency from considering others. NHTSA "shall consider":  (1) "technological feasibility," (2) "economic practicability," (3) "the effect of other motor vehicle standards of the Government on fuel economy," and (4) "the need of the United States to conserve energy." 49 U.S.C. § 32902(f); *see id.* § 32902(e)(B) (distinguishing between "*the* United States Government" and "*a* State or local government") (emphases added). But NHTSA must *not* consider, among other things, the fuel economy of automobiles operating on "alternative fuel," *id.* §§ 32901(a)(8), 32902(h)(1)—which includes vehicles operating on electricity, *id.* § 32901(a)(1)(J).

Each fuel-economy standard that NHTSA sets applies nationwide.  Congress recognized that the effectiveness of a uniform "single standard," S. Rep. No. 93-526, at 59 (1973), would be frustrated if States could second-guess NHTSA or adopt overlapping policies.  Congress therefore included in EPCA an express preemption provision of the broadest sort:  "a State … may not adopt or enforce a law or regulation *related to* fuel economy standards or average fuel economy standards."  49 U.S.C. § 32919(a) (emphasis added).

4

## 2.    Section 209 of the Clean Air Act

Section 209 of the Clean Air Act generally prohibits States from regulating new motor-vehicle emissions, instead entrusting such regulation to the federal government. 42 U.S.C. § 7543(a). Section 209(b), however, includes a narrow exception that allows California to apply for a limited waiver of preemption if, among other things, it "need[s]" separate standards "to meet compelling and extraordinary conditions" within the State. *Id.* § 7543(b)(1). If California successfully obtains a preemption waiver, other States can copy its standards under certain circumstances. *Id.* § 7507. A waiver under Section 209(b) waives only "the application of *this section*"—*i.e.*, Section 209 of the Clean Air Act. *Id.* § 7543 (emphasis added).

## 3.    The Renewable Fuel Standard

The Clean Air Act also includes the Renewable Fuel Standard (RFS) program, which "requires that increasing volumes of renewable fuel be introduced into the Nation's supply of transportation fuel each year." *Americans for Clean Energy* v. *EPA* (*ACE*), 864 F.3d 691, 697 (D.C. Cir. 2017). Two goals animate the RFS: (1) to "move the United States toward greater energy independence and security," and (2) to "increase the production of clean renewable fuels." *Id.* (quoting Pub. L. No. 110-140, 121 Stat. 1492, 1492 (2007)). To

these ends, "Congress ordained the inclusion of 4 billion gallons of renewable fuel in the Nation's fuel supply" for calendar year 2006, and required that, "[b]y 2022, the number will climb to 36 billion gallons." *HollyFrontier Cheyenne Refining, LLC* v. *Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2175 (2021).

## B.    Regulatory Background

### 1.    The SAFE rules

In 2012, California submitted to EPA a waiver application for a package of three standards, collectively labeled the "Advanced Clean Car" standards. *See* 78 Fed. Reg. 2,112 (Jan. 9, 2013). Two standards were aimed at addressing global climate change rather than improving California's air quality: (1) greenhouse-gas emission standards for vehicles; and (2) a sales mandate requiring automakers to meet an increasing quota of new electric or fuel-cell vehicles each year through model year 2025. *Id.* at 2,119. EPA granted the waiver in 2013.

In 2019, EPA rescinded that waiver in a joint rule with NHTSA entitled *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program*, or "SAFE I." 84 Fed. Reg. 51,310 (Sep. 27, 2019). NHTSA, for its part, determined that both the greenhouse-gas emission standards and

the electric-vehicle mandate were impermissibly "related to fuel economy" and were thus preempted by EPCA. *Id.* at 51,313.

Then, in 2020, NHTSA and EPA finalized a second joint rule entitled *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks*, or "SAFE II," to set harmonized fuel-economy and greenhouse-gas standards. 85 Fed. Reg. 24,174 (Apr. 30, 2020). Those standards required manufacturers to improve fleet-average fuel efficiency by 1.5% per year until model year 2026. *Id.* at 24,175.

### 2. The repeals of SAFE I and SAFE II

On the day he took office, President Biden directed NHTSA and EPA to "immediately" review and consider "suspending, revising, or rescinding" both SAFE I and SAFE II, 86 Fed. Reg. 7,037, 7,037 (Jan. 25, 2021), as part of a commitment to "develop[] rigorous new fuel economy standards aimed at ensuring 100% of new sales for light- and medium-duty vehicles will be electrified," *see* The Biden Plan for a Clean Energy Revolution and Environmental Justice, https://joebiden.com/climate-plan/#.

NHTSA took the first step, repealing its portion of SAFE I. 86 Fed. Reg. 74,236 (Dec. 29, 2021). NHTSA explained that it now believed that it could not "dictate or proclaim EPCA preemption with the force of law." *Id.* at

74,266.  NHTSA did not dispute SAFE I's interpretation of EPCA, but simply avoided "taking a position" on whether state greenhouse-gas and electric-vehicle programs are preempted under EPCA.  *Id.* at 24,237, 24,242-24,243.

Next, EPA issued new nationwide carbon-dioxide emission standards for light-duty vehicles expressly designed to "drive[]" the electrification of the vehicle fleet to 17% market-penetration by model year 2026.  86 Fed. Reg. 74,434, 74,484 (Dec. 30, 2021).  EPA had promulgated all its previous greenhouse-gas rules for motor vehicles jointly with NHTSA, but this time EPA decoupled its rulemaking from NHTSA's so that it would not be bound by Congress's command that NHTSA "may not consider" the fuel economy of electric vehicles in setting average fuel economy standards.  49 U.S.C. § 32902(h).

Third, EPA restored to California (and 17 other States that had adopted California's regulations) a waiver from Clean Air Act preemption for both its state greenhouse-gas emission standards and its zero-emission vehicle mandate.  87 Fed. Reg. 14,332 (Mar. 14, 2022).  EPA reasoned that it had improperly relied on EPCA preemption in SAFE I and that it had been too stringent in evaluating California's need for separate motor-vehicle standards aimed at combatting global climate change.  *Id.* at 14,335.

8

Finally, NHTSA issued the new fuel-economy standards challenged here. NHTSA's standards are largely "harmonized" with EPA's latest carbon-dioxide emission standards and require average fuel economy to increase 8% per year for model years 2024 and 2025 and 10% for model year 2026. 87 Fed. Reg. at 25,744.

To get there, NHTSA first estimated how the new vehicle fleet would develop if the agency took no action. 87 Fed. Reg. at 25,896. This "baseline" scenario "considered and accounted for California's Zero Emission Vehicle … program (and its adoption by a number of other States)." *Id.* at 25,722. NHTSA accounted for these state mandates because of "the clear reality that the state [zero-electric-vehicle] programs exist," because States are currently "free to enforce" them, and because "manufacturers are complying with them." *Id.* at 25,899. From this baseline, NHTSA then developed a series of four potential "Action Alternatives," all of which also "account[ed] for" these state electric-vehicle mandates, and selected one of them to form the standards in the final rule. *Id.* at 25,762-25,765. As the agency explained, the electric vehicles and other technologies in the baseline "are necessarily included in each of the Action Alternatives," including the one that NHTSA ultimately selected, so the "impacts of all the alternatives evaluated in the final rule are

against the backdrop of these State … actions."  Technical Support Document at 67.

## SUMMARY OF ARGUMENT

NHTSA's rule should be set aside because it is contrary to law and arbitrary and capricious.

I.    It was unlawful for NHTSA to incorporate state electric-vehicle mandates into its regulatory baseline because federal law twice preempts those state mandates.  First, EPCA expressly prohibits States from adopting or enforcing "a law or regulation related to fuel economy standards or average fuel economy standards."  49 U.S.C. § 32919(a).  State electric-vehicle mandates "relate[] to" fuel-economy standards because a rule that limits greenhouse-gas emissions is "effectively identical to a rule that limits fuel consumption."  *Delta Constr. Co.* v. *EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) (citation omitted).  Second, the RFS impliedly preempts state electric-vehicle mandates because those mandates conflict with Congress's policy decision to promote energy independence and security through the production of clean renewable fuels.

NHTSA's consideration of those preempted state mandates was unlawful.  EPCA prohibits NHTSA from considering electric vehicles' fuel

economy when setting its standards, and thus from mandating electrification. 49 U.S.C. § 32902(h); *see* AFPM Br. 27-35. NHTSA tried to circumvent that prohibition by relying on other regulators' electric-vehicle mandates. But the illegality of those other mandates leaves only *NHTSA's* fuel-economy standards to mandate electrification. That, in turn, is a clear violation of EPCA.

II.    At a minimum, NHTSA's failure to analyze the legality of the state laws it relied upon was arbitrary and capricious. Agencies must consider important aspects of the problem they address, including potential legal issues. *See Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania*, 140 S. Ct. 2367, 2383-2384 (2020). Here, NHTSA assumed that the state electric-vehicle mandates constitute real legal obligations for automakers, but it expressly declined to assess whether those obligations were valid and enforceable. That omission was especially egregious for two reasons. First, the agency had already analyzed the legality of those state mandates in SAFE I and had concluded that they *were* preempted. Although it withdrew that interpretation, it failed to conduct a new substantive preemption analysis concluding that the mandates were *not* preempted. Second, the preemption concerns here arise in part under EPCA, the very statute that NHTSA adminis-

11

ters.  Under those circumstances, the agency's decision to ignore a glaring legal problem is inconsistent with the APA's requirement of reasoned decisionmaking.

## STANDING

Intervenors include entities that produce or sell liquid fuels and the raw materials used to produce them, along with associations whose members include such entities.  NHTSA's fuel-economy standards are designed to "reduce domestic consumption of gasoline, producing a corresponding decrease in the Nation's demand for crude petroleum."  87 Fed. Reg. at 25,884; *see* 87 Fed. Reg. at 26,068 ("[T]he final standards will save approximately 234 billion gallons of gasoline through 2050.").  As explained in the accompanying declarations, depressing the demand for those fuels injures intervenors and intervenors' members financially.  This economic injury constitutes injury-in-fact under Article III that is caused by the challenged regulatory action and redressable by vacatur of the rule.  *See, e.g.*, *American Fuel & Petrochemical Mfrs.* v. *EPA*, 3 F.4th 373, 379-380 (D.C. Cir. 2021).

Intervenors that are membership associations also have associational standing to challenge NHTSA's decision.  *See Hunt* v. *Washington State Ap-*

*ple Advert. Comm'n*, 432 U.S. 333, 342-343 (1977). Their members have standing to sue in their own right, for the reasons described. The interests intervenors seek to protect are germane to their organizational purposes, which include safeguarding their members' businesses. And neither the claims asserted nor the relief requested requires the participation of individual members.

## STANDARD OF REVIEW

This Court "shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

## ARGUMENT

In setting fuel-economy standards, NHTSA accounted for several state electric-vehicle mandates as part of a regulatory "baseline" it constructed. 87 Fed. Reg. at 25,899. NHTSA claimed that those state mandates were "real" "legal obligations," which it would be "absurd" for the agency not to consider. *Id.* at 25,899, 25,983. As the AFPM and State Petitioners explain, the agency's consideration of those state electric-vehicle mandates violated EPCA. *See* Initial AFPM Br. 27-35. But NHTSA's reliance on state electric-vehicle man-

13

dates was also impermissible for another reason: those mandates are independently invalid because they are preempted by two federal laws, EPCA and the RFS. NHTSA's decision to incorporate those preempted laws into its calculations was thus contrary to law. At the very least, it was arbitrary and capricious for NHTSA to decline to even assess the legality of those mandates. Accordingly, the rule should be set aside.

## I.    NHTSA's Consideration Of State Electric-Vehicle Mandates Is Contrary To Law

### A.    EPCA Expressly Preempts State Electric-Vehicle Mandates

Congress expressly barred States from enacting the laws that NHTSA relied on here. EPCA prohibits States from adopting or enforcing "a law or regulation *related to* fuel economy standards or average fuel economy standards for automobiles." 49 U.S.C. § 32919(a) (emphasis added). The Supreme Court has described "related to" preemption provisions like this one as "deliberately expansive," *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U.S. 41, 46 (1987), and "conspicuous" in their breadth, *FMC Corp.* v. *Holliday*, 498 U.S. 52, 58 (1990). As the Court has explained, a state requirement "relate[s] to" a federal law or regulation as long as it has a "connection with," or contains a "reference to," the regulated topic. *Rowe* v. *New Hampshire Motor Transport Ass'n*,

552 U.S. 364, 370 (2008) (quoting *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).

State electric-vehicle mandates have a clear "connection with" fuel economy. Electric-vehicle mandates like California's require manufacturers to make a certain number of "vehicles that produce zero exhaust emissions of any criteria pollutant (or precursor pollutant) or greenhouse gas, excluding emissions from air conditioning systems." Cal. Code Regs. tit. 13, § 1962.2(a). Because emissions of the greenhouse gas carbon dioxide are "essentially constant per gallon combusted of a given type of fuel," the fuel economy of a vehicle and its carbon-dioxide emissions are two sides of the same coin. 75 Fed. Reg. at 25,324, 25,327 (May 7, 2010). Accordingly, "any rule that limits tailpipe [greenhouse gas] emissions is effectively identical to a rule that limits fuel consumption." *Delta Constr. Co.*, 783 F.3d at 1294 (citation omitted).

An electric-vehicle mandate thus has more than a mere "connection with" fuel economy—it has a direct correlation. That is why NHTSA previously issued all its fuel-economy rules jointly with EPA, which regulates tailpipe emissions. *See* 85 Fed. Reg. at 24,227. And that is why NHTSA considered these electric-vehicle mandates in setting fuel-economy standards.

Courts applying EPCA have had little trouble finding federal preemption of state laws promoting hybrid or electric vehicles. For example, the Second Circuit has held that EPCA preempts local taxi-fleet rules merely *encouraging* the adoption of hybrid taxis. *Metropolitan Taxicab Bd. of Trade* v. *City of New York*, 615 F.3d 152, 157 (2d Cir. 2010). The court explained that EPCA's broad preemption provision covers state laws that "make fuel economy standards essential to the operation of those rules," even if they do no more than "draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* The court further explained that laws promoting hybrid vehicles are not "neutral to the fuel economy of the vehicles to which they apply." *Id.* at 158.

The district court in *Ophir* v. *City of Boston*, 647 F. Supp. 2d 86, 94 (D. Mass. 2009), considered similar hybrid-taxi rules and likewise found them to be preempted. The court carefully examined both the "plain meaning" of EPCA's text and its "legislative history." *Id.* The court noted that Congress had considered and rejected narrower preemption provisions that would have covered only those state laws "inconsistent" or not "identical" to federal requirements. *Id.* at 93 (citations omitted). The court thus observed that, "had

16

Congress intended EPCA to preempt only narrowly, it would have drafted the act to have that effect." *Id.* at 94.

The state electric-vehicle mandates on which NHTSA relied here "relate[] to" fuel economy even more clearly than the taxi rules in *Metropolitan Taxicab* and *Ophir*. Electric-vehicle mandates plainly are not "neutral to the fuel economy of the vehicles to which they apply." *Metropolitan Taxicab*, 615 F.3d at 157-158. In fact, an earlier version of California's electric-vehicle regulations expressly addressed fuel economy, but California amended the regulations to remove "all references to fuel economy or efficiency" in response to litigation. 83 Fed. Reg. 42,986, 43,238 n.539 (Aug. 24, 2018) (citation omitted). The amended regulations' very purpose is to force automakers to produce electric vehicles, which EPCA and its implementing regulations treat as having significantly higher fuel economy than combustion-engine vehicles. *See* 49 U.S.C. § 32904(a)(2)(B); 87 Fed. Reg. at 25,780. Indeed, NHTSA recognized this connection in SAFE I, when it concluded that "regulations that require a certain number or percentage of a manufacturer's fleet of vehicles sold in a State to be [zero-emission vehicles] that produce no carbon dioxide

tailpipe emissions necessarily affect the fuel economy achieved by the manufacturer's fleet as well as the manufacturer's strategy to comply with applicable standards." 84 Fed. Reg. at 51,320.

EPCA's provisions directly addressing electric vehicles underscore the close relationship between electric-vehicle mandates and fuel economy. As discussed, EPCA forbids NHTSA from considering the fuel economy of electric vehicles in setting fuel-economy standards. It also allows manufacturers flexibility to utilize electric vehicles as a *compliance* option, and it provides incentives for doing so. *Id.* § 32904(a)(2). These provisions show that Congress recognized the direct connection between electric vehicles and fuel economy.

Separately, electric-vehicle mandates also relate to "average fuel economy" because they restrict manufacturers' choices as to how to meet those standards. EPCA allows manufacturers to meet NHTSA's fuel-economy standards by producing any combination of vehicles that the national market will bear, using whatever technological approach to fuel economy they think best. State electric-car mandates, by contrast, require automakers to comply in a specific way: either by selling a certain percentage of zero-emission vehicles or purchasing credits from competitors. The state mandates thus relate

18

to federal fuel-economy standards because they "force [a manufacturer] to adopt a certain scheme" and "restrict its choice" of compliance, and are thus preempted. *New York State Conf. of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U.S. 645, 668 (1995); *accord Ophir*, 647 F. Supp. 2d at 93.

Only two out-of-circuit district courts have reached a different conclusion, and both were wrong. *See Green Mountain Chrysler Plymouth Dodge Jeep* v. *Crombie*, 508 F. Supp. 2d 295 (D. Vt. 2007); *Central Valley Chrysler-Jeep, Inc.* v. *Goldstene*, 529 F. Supp. 2d 1151 (E.D. Cal. 2007). Those courts concluded that when EPA grants a Section 209 preemption waiver, it transforms state standards into federal fuel-economy standards, which EPCA then cannot preempt. But a Section 209 waiver alone does not transform a state law into federal law, and NHTSA does not suggest otherwise here. Moreover, EPCA treated California standards as federal standards for three model years only—1978 through 1980—but no longer does. *See* Ohio Br. at 39-41, *Ohio* v. *EPA*, No. 22-1081 (Nov. 2, 2022) (discussing the same preemption issue).

## B.    The RFS Impliedly Preempts State Electric-Vehicle Mandates

State electric-vehicle mandates are also impliedly preempted by a separate statutory provision, the RFS. State laws are impliedly preempted when they "stand[] as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress." *Arizona* v. *United States*, 567 U.S. 387, 406 (2012) (citation omitted). A "conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Id.* (citation omitted); *see Geier* v. *American Honda Motor Co.*, 529 U.S. 861, 881 (2000).

Here, state electric-vehicle mandates conflict with Congress's objectives in enacting the RFS. The RFS reflects Congress's policy decision to "move the United States toward greater energy independence and security" in a specific way: by "increas[ing] the production of clean renewable fuels" to be blended with fossil fuels. *ACE*, 864 F.3d at 697 (citations omitted). Mandating electrification—in other words, eliminating vehicles that use liquid renewable fuels—puts severe pressure on regulated entities' ability to comply with the RFS by reducing the percentage of vehicles that use those renewable fuels.

By contrast, Congress has never included electric-vehicle mandates in its energy-security plans and in fact has rejected several bills that would have imposed such mandates. *See, e.g.*, Zero-Emission Vehicles Act of 2019, H.R. 2764, 116th Cong. (2019); Zero-Emission Vehicles Act of 2018, S. 3664, 115th Cong. (2018). State electric-vehicle mandates wreak havoc on Congress's carefully crafted scheme in favor of an option that Congress has consistently rejected. *Cf. West Virginia* v. *EPA*, 142 S. Ct. 2587, 2614 (2022).

### C.    NHTSA's Reliance On Preempted State Laws Is Unlawful

It was unlawful for NHTSA to rely on—and incorporate into its calculations—state electric-vehicle mandates that are preempted.  Congress forbade NHTSA from considering electric vehicles in any fashion when determining the "maximum feasible" fuel-economy standards.    49 U.S.C. § 32902(h).  NHTSA thus may not set standards that would mandate an increased level of electric-vehicle penetration.

NHTSA therefore tried to slip in through the back door what it was barred from bringing through the front.  It reasoned that *someone else* was requiring the electric vehicles and it was merely acknowledging the natural effects of those requirements.  That reasoning is flawed under any circumstances.  *See* AFPM Br. 27-35.  But at a minimum, NHTSA's maneuver fails here because the other regulators on which it relied lacked authority to issue electric-vehicle mandates in the first place.  Because federal law preempts the state mandates that NHTSA accounted for, those state mandates cannot validly force more electric vehicles on the road.  As a result, only *NHTSA's* fuel-economy standards are left to require certain electric-vehicle penetration.  That, in turn, is a clear violation of EPCA.  NHTSA's decision to "consider[] and account[] for," 87 Fed. Reg. at 25,722, these unlawful state mandates is

therefore "not in accordance with law," 5 U.S.C. § 706(2)(A), and the rule must be set aside.

## II.  The Rule Is Arbitrary And Capricious

At the very least, NHTSA's failure to adequately consider the legality of the state electric-vehicle mandates was arbitrary and capricious.  "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan* v. *EPA*, 576 U.S. 743, 750 (2015) (citation omitted).  Thus, an agency must "reasonably consider[] the relevant issues and reasonably explain[]" why it favored the chosen action.  *FCC* v. *Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  Agency action that fails to grapple with an "important aspect of the problem" is arbitrary and capricious.  *DHS* v. *Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (citation omitted).  Significant legal issues with a chosen regulatory action are generally an "important aspect" of the problem.  *Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania*, 140 S. Ct. 2367, 2384 (2020).

Here, the legality of state electric-vehicle mandates was highly relevant to NHTSA's rulemaking.  As explained above, state regulators lacked authority to issue electric-vehicle mandates.  *See* Section I.A, *supra*.  And the state regulators' lack of authority left NHTSA in flagrant violation of EPCA.  *See*

22

Section I.C, *supra*.  Yet NHTSA expressly declined to grapple with that glaring problem with incorporating legally dubious state laws into its "baseline."

In response to comments addressing preemption problems with state electric-vehicle mandates, NHTSA asserted that it "is not taking a position on whether or not those programs are preempted under EPCA."  87 Fed. Reg. at 25,983.  Instead, without further analysis, NHTSA "incorporated those standards in the baseline because they are legal obligations applying to automakers during the rulemaking time frame, and are therefore relevant to understanding the state of the world."  *Id.*  That explanation is incoherent.  NHTSA's insistence that these mandates apply, as a matter of "reality," indicates that the agency *has* taken a position on their legal validity.  *Id.* at 25,899.  So NHTSA cannot simultaneously disavow any view on the merits of the preemption question.  *See American Fed. of Gov't Emps., Loc. 2924* v. *Federal Lab. Rels. Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006) ("Certainly, if the result reached is 'illogical on its own terms,' the [agency's] order is arbitrary and capricious.") (citation omitted).

In any event, even if NHTSA had merely observed that these state laws currently remain on the books, it could not reflexively incorporate those laws

into its analysis of "reality," given their obvious vulnerability to legal challenge. Whether state electric-vehicle mandates are "relevant to understanding the state of the world," or constitute automakers' "legal obligations" "during the rulemaking time frame," are questions that necessarily *turn on* whether those mandates may lawfully go into effect and automakers must comply with them. NHTSA thus could not have adequately considered that "important aspect of the problem," *DHS*, 140 S. Ct. at 1913, without at least considering serious legal challenges to the state mandates on which it relied.

NHTSA's failure to conduct the relevant legal analysis was especially arbitrary here because when the agency last substantively considered whether these state electric-vehicle mandates were preempted (in SAFE I), it concluded that they *were*. When NHTSA reconsidered SAFE I, the agency expressly declined to adopt "new generally applicable positions" on EPCA preemption, or even to assess "whether any individual program"—including those at issue here—"is preempted or not." 86 Fed. Reg. at 74,243, 74,261. Instead, the agency vaguely pledged that it "continues to deliberate further about the complex substantive issues surrounding EPCA preemption." *Id.* at 74,264. NHTSA did not announce its promised new preemption analysis before assuming in the present rule that the state mandates were "real" "legal

obligations."  When an agency "depart[s] from a prior policy," it "must show that there are good reasons for" doing so.  *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  It was arbitrary and capricious for NHTSA to flip positions and rely on state standards that the agency had previously concluded were preempted, without performing any new substantive preemption analysis.

NHTSA suggested it could evade its responsibility to consider the legality of those state mandates because it lacks "authority to make such determinations with the force of law."  87 Fed. Reg. at 25,983.  That argument misses the point.  Even if NHTSA cannot make a determination "with the force of law" about whether a state law is preempted, that does not excuse the agency from reaching a considered judgment about whether it is appropriate to rely on legally dubious state laws to make a baseline calculation that forms the foundation for its rulemaking.  Agencies can be required to consider legal questions, including the constitutionality of their own rulemaking, even when those decisions may lack the force of law. *See National Urb. League* v. *Ross*, 977 F.3d 770, 777 (9th Cir. 2020); *Picur* v. *Kerry*, 128 F. Supp. 3d 302, 310 (D.D.C. 2015) (K.B. Jackson, J.); *cf. Sid Goodman & Co.* v. *United States*, 1991 WL 193489, at *5 (4th Cir. Oct. 1, 1991).  In such circumstances, the APA

does not expect binding legal determinations, only reasoned consideration of the relevant issues.  Indeed, such reasoned consideration is particularly appropriate to require here, where the legal issues involve the very statute that the agency administers.  NHTSA's failure to conduct that reasoned decisionmaking was arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court should set aside NHTSA's rule.

DECEMBER 8, 2022                                    Respectfully submitted,

                                                   /s/ Jeffrey B. Wall
C. BOYDEN GRAY                                     JEFFREY B. WALL
JONATHAN BERRY                                     MORGAN L. RATNER
MICHAEL BUSCHBACHER                                SULLIVAN & CROMWELL LLP
JARED M. KELSON                                    1700 New York Avenue, NW
BOYDEN GRAY & ASSOCIATES, PLLC                     Washington, DC  20006
801 17th Street NW, Suite 350                      (202) 956-7500
Washington, DC  20006                              wallj@sullcrom.com
(202) 955-0620
buschbacher@boydengray                             *Counsel for Intervenor Valero*
associates.com                                     *Renewable Fuels Company, LLC*

*Counsel for Intervenors*

26

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(f) and (g), along with the Court's September 22, 2022 Order, because it contains 5,000 words.

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

/s/ Jeffrey B. Wall

JEFFREY B. WALL

DECEMBER 8, 2022

## CERTIFICATE OF SERVICE

I hereby certify that, on this 8th day of December, 2022, I electronically filed the foregoing Brief with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

/s/ Jeffrey B. Wall
JEFFREY B. WALL

DECEMBER 8, 2022